638 S.E.2d 727

**Shawn PETHEL, aka, Shawn Pethtel, Petitioner Below, Appellee**

v.

**Thomas McBRIDE, Warden, Mount Olive Correctional Center Respondent Below, Appellant.**

No. 32784.

Supreme Court of Appeals of West Virginia.

Submitted March 1, 2006.

Decided June 8, 2006.

Dissenting Opinion of Justice Starcher July 12, 2006.

Concurring Opinion of Justice Maynard July 18, 2006.

Scott R. Smith, Ohio County Prosecuting Attorney, William J. Ihlenfeld, II, Ohio County Assistant Prosecuting Attorney, Wheeling, for Appellants.

Mark Panepinto, Wheeling, for Appellee.

BENJAMIN, Justice:

In the instant appeal of the circuit court's order granting habeas corpus relief, Appellee, Shawn Pethel, aka, Shawn Pethtel (hereinafter "Pethel"), urges this Court to affirm the Circuit Court of Ohio County decision setting aside his conviction on multiple counts of sexual assault, filming a minor in sexually explicit conduct, possession of a controlled substance with intent to deliver, nighttime burglary, and conspiracy, together

with his corresponding sentence of 53 to 155 years in the West Virginia State Penitentiary because, he contends, the State of West Virginia violated the Interstate Agreement on Detainers Act (hereinafter "IAD").[1] After considered review of the record presented to this Court and pertinent legal authorities, we refuse Pethel's request and reverse the Circuit Court of Ohio County's September 14, 2004 order.

1. The IAD is an interstate compact joined by 48 states and the federal government relating to the transfer of prisoners serving sentences in one jurisdiction to another jurisdiction for trial on pending charges. The IAD is discussed more fully *infra.*

2. Specifically, the indictment charged Pethel with twenty counts of violating W. Va.Code § 61–8B–5(a)(2) (1984) which provided:
 (a) A person is guilty of sexual assault in the third degree when:
 (2) The person, being sixteen years old or more, engages in sexual intercourse or sexual intrusion with another person who is less than sixteen years old and who is at least four years younger than the defendant.
 Prior to Pethel's trial, this statute was amended effective June 7, 2000, to add the phrase "and is not married to the defendant" to the end of subsection 2.

3. The September 13, 1999 indictment charged Pethel with three counts of violating W. Va.Code § 61–8C–2(b) (1986) which provides:
 (b) Any person who photographs or films such minor engaging in any sexually explicit conduct shall be guilty of a felony, and, upon conviction thereof, shall be fined not more than ten thousand dollars, or imprisoned in the penitentiary not more than ten years, or both fined and imprisoned.

4. The indictment charged Pethel with one count of violating W. Va.Code § 60A–4–401(a)(i) (1983) and W. Va.Code § 60A–2–206(b)(4) (1998) and one count of violating W. Va.Code § 60A–4–401(a)(ii) (1983) and W. Va.Code § 60A–2–204(d)(14) (1998). W. Va.Code § 60A–4–401(a)(i) and (ii) (1983) provide:
 (a) Except as authorized by this act, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance. Any person who violates this subsection with respect to:
 (i) A controlled substance classified in Schedule I or II, which is a narcotic drug, is guilty of a felony and, upon conviction, may be imprisoned in the state correctional facility for not less than one year nor more than fifteen years, or fined not more than twenty-five thousand dollars, or both;
 (ii) Any other controlled substance classified in Schedule I, II, or III is guilty of a felony and,

## I.

## FACTUAL AND PROCEDURAL HISTORY

On September 13, 1999, Pethel was indicted by the Ohio County Grand Jury on twenty counts of sexual assault in the third degree[2], three counts of filming a minor in sexually explicit conduct[3], two counts of possession with intent to deliver[4], one count of nighttime burglary[5], five counts of conspiracy[6] and one count of grand larceny[7]. The

upon conviction, may be imprisoned in the state correctional facility for not less than one year nor more than five years, or fined not more than fifteen thousand dollars, or both[.]
 W. Va.Code § 60A–2–204(d)(14) (1998) defines marijuana, by its chemical name, as a Schedule I non-narcotic controlled substance.
 W. Va.Code § 60A–2–206(b)(4) (1998) defines certain substances derived from coca leaves, such as cocaine, as a Schedule II substance.

5. Pethel was indicted by the grand jury with violating W. Va.Code 31–3–11(a) (1993) which provides:
 (a) Burglary shall be a felony and any person convicted thereof shall be confined in the penitentiary not less than one nor more than fifteen years. If any person shall, in the nighttime, break and enter, or enter without breaking, or shall, in the daytime, break and enter, the dwelling house, or an outhouse adjoining thereto or occupied therewith, of another with the intent to commit a crime therein, he shall be deemed guilty of burglary.

6. The grand jury indicted Pethel on five counts of conspiracy. Two of the conspiracy counts relate to the two counts of possession of a controlled substance with intent to deliver. A third relates to one of the charges for filming a minor in sexually explicit conduct. The fourth and fifth conspiracy counts relate to the charges of night time burglary and grand larceny. W. Va.Code § 61–10–31 (1971) defines the crime of conspiracy as:
 It shall be unlawful for two or more persons to conspire (1) to commit any offense against the State or (2) to defraud the State, the state or any county board of education, or any county or municipality of the State, if, in either case, one or more of such persons does any act to effect the object of the conspiracy...

7. The grand jury charged Pethel with violation of W. Va.Code § 61–3–13(a) (1994) which states:
 (a) If a person commits simple larceny of goods or chattels of the value of one thousand dollars or more, such person is guilty of a felony, designated grand larceny, and, upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years, or, in the discretion of the court, be confined in jail not more than one year and

charges set forth in the indictment arise from an investigation into a burglary of a home in Wheeling, Ohio County, West Virginia. The investigation into this burglary led authorities to Pethel, three of his friends, Eric Gorczyca, Michael McWhorter and David Wayne Morris, Jr., and evidence relating to drug activity. The evidence obtained during the preliminary investigation was sufficient to obtain a search warrant for the house shared by Pethel and Gorczyca.

During execution of the search warrant, authorities recovered a video tape depicting various scenes of guns, drugs and sexual activity with young girls. The video depicted Pethel hiding a video camera under clothes in his bedroom, and, a few moments later, reentering the bedroom with a blonde girl who was then videotaped, apparently without her knowledge, performing fellatio on Pethel. The video also depicted Pethel showing McWhorter where the video camera was hidden and then leading this same girl into the bedroom where she was videotaped, apparently without her knowledge, performing fellatio on McWhorter. After these two video depictions, the video shows Pethel commenting that he had just "pimped out some b** ch." It also depicts him holding large bags containing a substance believed to be marijuana, commenting upon the failure of law enforcement to find the substance when they picked the girl up, and asking if anyone wanted to party.[8]

On December 12, 1998, Ohio County Sheriff deputies retrieved fifteen year old runaway Stacey S.[9] from Pethel's residence. Stacey was the blonde girl depicted on the video. On that date, Pethel was twenty-two years old.[10] At trial, Stacey testified that she met Pethel while she was walking along a road with her ten year old cousin. Pethel, who was driving by, stopped to talk to the girls. Stacey was thirteen years old at that time. Pethel gave Stacey his pager number and told her to call him.[11] Stacey testified that she and Pethel engaged in oral sex and sexual intercourse numerous times prior to the act shown on the videotape. She testified that she was filmed without her knowledge.

The videotape seized during the execution of the search warrant also contained a scene wherein a dark haired girl, subsequently identified as Jessica J.,[12] performed fellatio on Pethel. Jessica testified at trial that she met Pethel through a friend with whom she was living while in a group home/juvenile facility located in Wellsburg, West Virginia. She testified that she and Pethel began having sexual relations, including fellatio and intercourse, when she was in the eighth grade.[13] Jessica described a primarily sexual relationship spanning several years and ending shortly after her sixteenth birthday.[14]

---

shall be fined not more than two thousand five hundred dollars.

8. The videotape contained images of numerous guns in the house shared by Pethel and Mr. Gorczyca, including a scene where Pethel pointed a gun to a man's head while attempting to wake the man from sleep.

9. Due to the sensitive nature of this matter and the girl's age at the time of the incidents in question, we follow our longstanding practice of identifying minors by initials. *See, e.g., In re Stephen Tyler R.*, 213 W.Va. 725, 729, 584 S.E.2d 581, 585, n. 1 (2003); *In re Jonathan P.*, 182 W.Va. 302, 303, 387 S.E.2d 537, 538, n. 1 (1989).

10. Pethel's date of birth is February 10, 1976.

11. At trial, Pethel disputed how he met Stacey. According to him, the first time he spoke to Stacey was when she paged him and he called her back. He claimed he met her a few days later as she was walking by his apartment on Wheeling Island. He contended that she stopped and introduced herself. He testified that he did not see her again until she paged him several months later to pick her up in East Wheeling. He then brought her to his apartment in Warwood where he videotaped her performing oral sex on both he and McWhorter. He admitted that he videotaped her without her knowledge, but disputed ever knowing that she was under the age of eighteen.

12. *See, supra,* note 9.

13. Jessica's date of birth is November 11, 1982. Pethel was therefore more than six years older than Jessica at all times relevant herein. She testified that she believed she was fourteen the first time she had sexual relations with Pethel. However, during the investigation, she first told the investigating officer that she was twelve years when she began having sexual intercourse with Pethel.

14. Pethel maintained he did not meet Jessica until September 1998, when he was introduced

She testified that she and Pethel had sexual relations at both his apartment on Wheeling Island and later at his house in Warwood on those occasions when she was home for visits from the group home/juvenile facility. She testified that it appeared the videotape was filmed shortly after her sixteenth birthday, although she did not know she was being recorded.[15]

At the time of his September 13, 1999 indictment, Pethel was serving a one-year sentence in the State of Ohio, at the Correctional Reception Center in Orient, Ohio, following revocation of parole granted in the State of Ohio.[16] On September 18, 1999, the State admittedly placed a detainer on Pethel. On that same date, Pethel executed a series of forms initiating a voluntary return and request for final disposition pursuant to Article III of the IAD.[17] Thereafter, on October 1, 1999, the State initiated the involuntary return of Pethel through a request for temporary custody pursuant to Article IV of the IAD.[18]

Pethel was thereafter returned to the State of West Virginia for his October 12, 1999 arraignment in the Circuit Court of

Ohio County before the Honorable Fred Risovich, II.[19] He was represented by previously appointed counsel. At the October 12, 1999 arraignment, Pethel pleaded not guilty to the charges in the indictment and trial was set for December 27, 1999. Though not specifically informing the Court that the IAD had been triggered, the State of West Virginia informed the trial court [20] that Pethel was then currently serving a prison sentence in Ohio, that he was brought to West Virginia for arraignment and that the State would make calls after the hearing to "make sure he can stay here or do my best to allow him to stay here." Pethel's counsel indicated that he did not object to Pethel remaining in West Virginia.[21] After setting a hearing for October 18, 1999, the trial court remanded Pethel "back to the custody of the Sheriff and eventually back to the State of Ohio to continue serving his prison term."

At the October 18, 1999 hearing, court-appointed counsel moved to withdraw from Pethel's representation due to the discovery of several conflicts of interest which Pethel refused to waive. The motion was granted

to her at his residence on Wheeling Island. He testified he thought she was eighteen years old and denies ever knowing she was in a juvenile facility. He testified he had sexual relations with her on only one occasion prior to the incident which was videotaped.

15. Pethel admitted under oath that he did not inform Jessica she was being filmed.

16. According to the Pre–Sentence Investigation Report in the instant matter, on July 1, 1998, Pethel was found guilty of the trafficking of a controlled substance, specifically marijuana, in the Court of Common Pleas of Belmont County, Ohio. He was sentenced to five years of community controlled sanctions including four months in the Belmont County, Ohio, Jail and six months in the East Ohio Correctional Center. On August 30, 1999, he was sentenced to serve one year at the Correctional Center in Orient, Ohio, for violating community controlled sanctions. This sentence was scheduled to expire on April 15, 2000.

17. Article III of the IAD governs requests by those imprisoned in one state and charged with crimes in another to be returned to the charging state for final disposition of the charges, including trial. See, W. Va.Code § 62–14–1, Article III, (1971); 18 U.S.C.App. § 2, Article III (1970).

18. Article IV of the IAD governs requests by charging statutes for the temporary return of persons imprisoned in another state for disposition, including trial, of criminal charges pending in the charging state. See, W. Va.Code § 62–14–1, Article IV, (1971); 18 U.S.C.App. § 2, Article IV (1970).

19. The record is unclear as to whether Pethel was returned to West Virginia on October 11, 1999 or October 12, 1999.

20. Because separate judges in the Circuit Court of Ohio County presided over Pethel's pretrial/trial proceedings and the instant habeas proceeding, we shall refer herein to the "trial court" when speaking of rulings and proceedings occurring prior to the filing of the instant habeas action. Similarly, we shall use the term "circuit court" to refer to rulings and proceedings below in the instant habeas proceeding.

21. Specifically, counsel stated "We would not oppose Mr. Smith's objection to him remaining in the State." Pethel has repeatedly maintained that he expressed a desire to remain in West Virginia pending trial at the October 12, 1999 arraignment. This statement by counsel is the only statement disclosed in the transcript of the October 12, 1999 arraignment to support Pethel's representation and is located on the page of the transcript cited by Pethel.

and new counsel was appointed. Prior to the end of the hearing, original counsel informed the trial court that Ohio had placed a hold on Pethel. The State then informed the trial court that it had arranged for Pethel to remain in West Virginia indefinitely, to which the trial court responded "[t]he problem is I don't want him for an indefinite period. I don't want our county to have to pay the costs of keeping him here." After learning that the location of Pethel's Ohio incarceration was more than an hour's drive away, the trial court remanded Pethel to the Ohio County Sheriff for three days to permit Pethel to confer with newly appointed counsel,[22] after which he was to be returned to Ohio. Pethel was ultimately returned to the State of Ohio on October 27, 1999, after spending approximately sixteen days in West Virginia.

On November 18, 1999, Pethel filed a motion to dismiss, with prejudice, the charges against him alleging that the IAD's anti-shuttling provisions contained in W. Va.Code § 62–14–1, Article IV(e),[23] had been violated when he was returned to the State of Ohio prior to a trial on the merits of the charges asserted against him. On November 30, 1999, a combined suppression hearing was scheduled with respect to each of the four defendants charged in the September 13, 1999 indictment. Counsel for Pethel appeared, but Pethel did not. He had refused to return to West Virginia from Ohio. At that hearing the trial court noted that Pethel was sent back to Ohio "to facilitate straightening up certain probationary matters he had pending in Ohio" and that dismissal was not required pursuant to West Virginia case law.[24] Mr. Pethal's counsel objected to proceeding with the suppression hearing in Pethel's absence. The trial court agreed not to proceed with the suppression hearing with respect to Pethel. Another hearing was held on December 7, 1999, in anticipation of the upcoming December 27, 1999 trial date. Again, Pethel objected to returning to West Virginia and did not appear. The State of Ohio refused West Virginia's request for return. The trial court indicated that he had previously ruled Pethel's return to Ohio prior to trial was in Pethel's best interest.[25] Ultimately, the trial court found just cause to continue the December 27, 1999, trial due to Pethel's refusal to return to West Virginia.[26]

**22.** Newly appointed counsel moved to withdraw on October 20, 1999. This motion was granted and yet another attorney appointed. Between arraignment and trial, no less than seven attorneys who were appointed to represent Pethel withdrew from representation prior to the appointment of his ultimate trial counsel. Pethel sought removal of trial counsel immediately prior to trial via a letter to the trial court alleging trial counsel had not followed his instruction regarding his defense. Upon questioning by the trial court, it was discovered that all matters raised by Pethel had been addressed by trial counsel and Pethel's *pro se* motion was denied.

**23.** W. Va.Code § 62–14–1, Article IV(e) provides:

Any request for final disposition made by a prisoner pursuant to paragraph (a) hereof shall also be deemed to be a waiver of extradition with respect to any charge or proceeding contemplated thereby or included therein by reason of paragraph (d) hereof, and a waiver of extradition to the receiving State to serve any sentence there imposed upon him, after completion of his term of imprisonment in the sending State. The request for final disposition shall also constitute a consent by the prisoner to the production of his body in any court where his presence may be required in order to effectuate the purposes of this agreement and a further consent voluntarily to be returned to the original place of imprisonment in accordance with the provisions of this agreement. Nothing in this paragraph shall prevent the imposition of a concurrent sentence if otherwise permitted by law.

Although Pethel's motion and memorandum in support cite to Article III(e), it appears he was actually relying upon the anti-shuttling provision contained in Article III(d). W. Va.Code § 62–14–1, Article III(d) provides, in pertinent part, [i]f trial is not had on any indictment, information or complaint contemplated hereby prior to the return of the prisoner to the original place of imprisonment, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

**24.** The trial court also noted that Pethel had requested his return to Ohio. However, that request does not appear in the hearing transcripts.

**25.** Pethel's counsel objected to this observation while the prosecutor agreed with the trial court the findings had been made. The record reveals only the trial court's prior comments that Pethel was returned to Ohio to deal with probationary matters.

**26.** In the January 11, 2000, order reflecting the trial court's findings at the December 7, 1999,

Upon completion of his sentence in Ohio, Pethel was ordered to be extradited to the State of West Virginia pursuant to a May 1, 2000 Order of the Court of Common Pleas of Noble County, Ohio.

Trial counsel argued the previously filed Motion to Dismiss at hearings held on July 13, 2000, and July 26, 2000. At the hearing held on July 13, 2000, argument was focused upon whether dismissal was mandated for failing to bring Pethel to trial within 120 days of his being brought to West Virginia in October, 1999.[27] At the hearing held on July 26, 2000, extensive argument was presented regarding whether the IAD's anti-shuttling provisions had been violated, whether Pethel was returned to Ohio for his own benefit and whether he waived the anti-shuttling provisions by failing to object to his return to Ohio. The trial court ultimately held, as reflected in its order dated August 10, 2000, that dismissal was not required as Pethel's return to the State of Ohio was in furtherance of efforts to rehabilitate him, that he did not languish in the West Virginia court system, and that there was no objection to his return.

After a jury trial on November 16 and 17, 2000, Pethel was convicted of twenty counts of sexual assault in the third degree, three counts of filming a minor in sexually explicit conduct and one count of conspiracy.[28] Pursuant to a plea agreement, on November 28, 2000, Pethel pleaded guilty to one count of possession with intent to deliver a Schedule I controlled substance and nighttime burglary. The remaining counts of the indictment were dismissed pursuant to the plea agreement. At the plea hearing on November 28, 2000, Pethel agreed, when questioned by the trial court, that he was waiving "all pretrial defects with regard to [his] arrest, the gathering of evidence, prior confessions; and ... all non-jurisdictional defects in the criminal proceedings against" him. On December 5, 2000, Pethel was sentenced to serve not less than 53 nor more than 155 years in the West Virginia State Penitentiary.[29]

On December 18, 2003, Pethel filed a petition for appeal of his guilty verdict to this Court.[30] In that appeal, Pethal argued that his rights under the IAD had been violated, and that this violation mandated dismissal of the charges against him, that he had received ineffective assistance of counsel and that his sentence was so disproportionate to the

hearing and continuing the previously scheduled trial, the trial court found Pethel had appeared in the trial court "for arraignment and had been returned to the State of Ohio for his own best interest in that he had a probation violation matter in the State of Ohio and returning [him] to the State of Ohio would assist him in dealing with his probation matters and his return to the State of Ohio was a benefit to" him.

27. At the time of the hearing held on July 13, 2000, trial was scheduled for July 26, 2000. With Pethel's agreement, the trial was tentatively continued until August 22, 2000.

28. The previously schedule August trial was continued upon Pethel's motion. During the course of the November trial, Pethel's family members attempted to obtain a mistrial on two occasions. First, Pethel's mother alleged she saw a female juror "stopping by" the prosecutor's office on her way to court the morning of the second day of trial. Upon questioning under oath by the trial court, Pethel's mother admitted she only saw the juror exit the elevator on the second floor of the court house and turn right. While the prosecutor's office is located on the second floor, the ladies' rest room is located to the right of the elevator on the second floor.

Secondly, Pethel's brother alleged to have overheard the assistant prosecutor trying the case speaking to another attorney in the hall outside the court room after lunch during the first day of trial. The brother alleged one of the men stated that his cousin was on the jury and one of the men stated "it's a shoe-in" or "locked in." The trial court questioned both the brother and the other attorney, who was not a member of the prosecutor's officer, under oath. The attorney admitted that he informed the assistant prosecutor that his cousin was on the jury and that he had a "good looking jury." It was also noted that the assistant prosecutor did not know the juror was the attorney's cousin prior to the conversation. After hearing testimony on this matter, the trial court found no grounds for a mistrial.

29. At the sentencing hearing, trial counsel was permitted to withdraw as counsel of record. Current appellate counsel was subsequently appointed by the trial court.

30. Although December 18, 2003, was well beyond the four month appeal period, Pethel had received numerous extensions of the period within which to file his appeal due to problems in obtaining the relevant hearing and trial transcripts.

crimes committed that it violated both the *United States Constitution* and the *West Virginia Constitution.* With respect to the IAD, Pethel argued that his return to the State of Ohio prior to being tried on the charges in West Virginia violated the anti-shuttling provisions of the IAD.[31] Relying upon *Alabama v. Bozeman,* 533 U.S. 146, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001). Pethel asserted that the IAD violation mandated dismissal of the charges against him.[32] This Court unanimously refused Pethel's petition for appeal on April 1, 2004. Pethel did not seek further appeal of his convictions.

On March 4, 2004, while his petition for appeal was still pending before this Court, Pethel filed a Petition for Writ of Prohibition with this Court, arguing that he was being wrongfully imprisoned based upon a clearly erroneous conviction and that his sentences were of no legal effect. He based the Petition on the alleged violation of the IAD, arguing that the IAD stripped the trial court of jurisdiction to proceed on the charges asserted against him. He again raised *Bozeman* in support of his writ petition. This Court unanimously denied Pethel's writ petition on May 6, 2004.

Prior to filing his petitions for appeal and prohibition with the Court, Pethel also filed a Petition for Writ of Habeas Corpus in the Circuit Court of Ohio County on September 25, 2003. Pethel did not pursue this habeas petition until after this Court denied him relief on his petition for appeal and on his writ petition. After this Court denied Pethel relief on these petitions, he proceeded with the habeas corpus petition in the Circuit Court of Ohio County. As with his prior filings in this Court, Pethel argued that violation of the IAD's anti-shuttling provisions required that his convictions, including the drug charge and nighttime burglary charge for which he had pleaded guilty, be vacated and that all charges against him be dismissed. Again, he relied upon *Bozeman.* During a hearing on September 14, 2004, the circuit court found that Pethel's acknowl-edged failure to object to his return to Ohio did not constitute a knowing and intelligent waiver of the anti-shuttling provisions of the IAD. The circuit court further found *Bozeman* to be controlling and that *Bozeman* required dismissal of the charges against Pethel. On November 16, 2004, the circuit court entered a written order memorializing its findings from the September 14, 2004 hearing. In the order, the circuit court found that the violation of the IAD removed jurisdiction from the State of West Virginia to try Pethel on the charges contained in the indictment. The circuit court stayed execution of the order until December 15, 2004 to permit the State time to appeal the same to this Court.

On November 18, 2004, the State filed its petition for appeal with this Court. Simultaneously therewith, the State filed a motion to stay execution of the circuit court's November 14, 2004 order. By order dated December 2, 2004, this Court stayed execution of the circuit court order pending resolution of the State's petition for appeal. This Court granted the State's petition on July 5, 2005.

## II.

### STANDARD OF REVIEW

At the heart of this appeal is the circuit court's interpretation of the IAD and its application of a United States Supreme Court decision. The IAD "is an interstate compact to which the State is a party by statutory enactment." *State ex rel. Modie v. Hill,* 191 W.Va. 100, 102, 443 S.E.2d 257, 259 (1994). As previously noted, our review of circuit court decisions interpreting the IAD is plenary and *de novo* as they present questions of law and statutory interpretation. *State v. Somerlot,* 209 W.Va. 125, 128, 544 S.E.2d 52, 55 (2000), quoting, *State v. Smith,* 198 W.Va. 702, 707, 482 S.E.2d 687, 690 (1996)("To the extent this issue presents a question of law and statutory interpretation, our review is plenary and *de novo.*"). Fur-

**31.** Pethel argued it was unnecessary to determine if the case proceeded pursuant to Article III or Article IV of the IAD because each contained nearly identical anti-shuttling provisions mandating dismissal.

**32.** *Bozeman* will be discussed more fully *infra.*

ther, as the federal government is a party to the IAD, it constitutes federal law, subject to federal construction. *Somerlot*, 209 W.Va. at 128, 544 S.E.2d at 55, *quoting, Carchman v. Nash*, 473 U.S. 716, 719, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985) ("[t]he Agreement is a congressionally sanctioned interstate compact within the Compact Clause, U.S. Const. Art. I, § 10, cl. 3, and thus is a federal law subject to federal construction."); *see also, New York v.* Hill, 528 U.S. 110, 111, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000), *quoting, Carchman; State v. Gamble*, 211 W.Va. 125, 130, 563 S.E.2d 790, 795 (2001). With these standards in mind, we turn to the issues presented herein.

## III.

## DISCUSSION

In its order granting habeas corpus relief, the circuit court relied upon the United States Supreme Court's decision in *Alabama v. Bozeman*, 533 U.S. 146, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001), to find that the trial court did not have jurisdiction to try Pethel relative to charges contained in the September 1999, indictment. In *Bozeman*, the Supreme Court held that a violation of the anti-shuttling provision contained in Article IV(e) of the IAD mandated dismissal of firearms charges brought against *Bozeman* by the State of Alabama. *Bozeman*, 533 U.S. at 149, 121 S.Ct. 2079. Bozeman had been serving a federal prison sentence in Florida when he was transported to Covington County, Alabama for arraignment. He was returned within one day to the federal prison. 533 U.S. at 151, 121 S.Ct. 2079. Upon return to Alabama one month later, Bozeman moved to dismiss the charges alleging a violation of the IAD's anti-shuttling provisions. *Id.* The trial court denied the motion finding Bozeman's interest in rehabilitation received in federal prison was facilitated by his return pending trial. *Id.* at 152, 121 S.Ct. 2079. Upon appeal, Bozeman's conviction was upheld by an intermediate court of appeals. On further appeal of his conviction, the Alabama Supreme Court reversed Bozeman's conviction, finding that the literal language of the IAD required dismissal of the charges. *Id.* The United States Supreme Court affirmed

the Alabama Supreme Court and rejected Alabama's argument, which was supported by the United States Solicitor General, that the violation was *de minimus*, technical and harmless and that the return was helpful to Bozeman's rehabilitation. *Id.* at 152–156, 121 S.Ct. 2079.

While it appears, at first blush, that *Bozeman* would control this matter, we find that it does not. Given the current procedural posture of this case—the appeal by the State of a final order in a habeas proceeding—we must first determine whether alleged violations of the IAD may be remedied in a habeas proceeding. As discussed in Section A, *infra*, we find that they may not. This Court finally disposed of all state court review of Pethel's IAD arguments when we rejected both his direct petition for appeal and his petition for writ of prohibition in 2004. He did not seek further appeal after the rejection by this Court of his direct petition for appeal. Secondly, we find, as discussed in Section B, *infra*, that Pethel waived at least a portion of his IAD claims when he pleaded guilty to certain charges contained in the September 13, 1999 indictment. The IAD is not a jurisdictional statute, the violation of which strips a trial court of jurisdiction over pending charges or precludes waiver by guilty plea. Finally, we conclude that our Legislature intended our adoption of the IAD to be consistent with the federal IAD enactment. Thus, as explained in Section C, *infra*, we adopt herein the federal amendments to the IAD which provide that any dismissal for violation of the IAD may be with or without prejudice.

### A.

### Availability of Habeas Corpus Arising From Violation of the IAD

 The right to habeas relief is, by necessity, limited. If it were not, criminal convictions would never be final and would be subject to endless review. Pursuant to W. Va.Code § 53–4A–1 (a) (1967):

Any person convicted of a crime and incarcerated under sentence of imprisonment therefor who contends that there was such a denial or infringement of his rights as to

render the conviction or sentence void under the Constitution of the United States or the Constitution of this State, or both, or that the court was without jurisdiction to impose the sentence, or that the sentence exceeds the maximum authorized by law, or that the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under the common-law or any statutory provision of this State, may, without paying a filing fee, file a petition for a writ of habeas corpus ad subjiciendum, and prosecute the same, seeking release from such illegal imprisonment, correction of the sentence, the setting aside of the pleas, conviction and sentence, or other relief, if and only if such contention or contentions and the grounds in fact or law relied upon in support thereof have not been previously and finally adjudicated or waived in the proceedings which resulted in the conviction and sentence, or in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article, or in any other proceeding or proceedings which the petitioner has instituted to secure relief from such conviction or sentence. . . .

Accordingly, habeas relief is available only where: (1) there is a denial or infringement upon a person's constitutional rights; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the legal maximum; or (4) the conviction would have been subject to collateral attack by statute or at common-law prior to the adoption of W. Va.Code § 53–4A–1. At issue herein is whether the pre-trial violation of the IAD's anti-shuttling provision provides a basis for habeas relief. As the IAD does not pre-date W. Va.Code § 53–4A–1 and does not involve illegal sentencing, habeas relief would only be available for IAD violations if the IAD involves constitutional protections or jurisdictional matters. We find that it involves neither.

### i.

### Violation of the IAD does not constitute a deprivation or infringement of constitutional rights

■ Both the *Constitution of the United States* and the *Constitution of West Virginia* bestow certain rights to citizens, such as the rights for citizens accused of crimes to due process, a fair and speedy trial, and protection from cruel and unusual punishment. It is the violation of such constitutional rights that the writ of habeas corpus is designed to remedy. As stated by the United States Court of Appeals for the Ninth Circuit "[t]he protections of the IAD are not founded on constitutional rights, or the preservation of a fair trial, but are designed to facilitate a defendant's rehabilitation in prison and to avoid disruptions caused when charges are outstanding against the prisoner in another jurisdiction." *United States v. Black,* 609 F.2d 1330, 1334 (9th Cir.1979).

■ Various courts which have addressed the issue have uniformly found that the procedural mechanisms set forth in the IAD do not rise to the level of constitutional rights. *See, e.g., Reed v. Farley,* 512 U.S. 339, 352–354, 114 S.Ct. 2291, 2299–2300, 129 L.Ed.2d 277 (1994) (discussing IAD violation in context of non-constitutional claims); *Cross v. Cunningham,* 87 F.3d 586, 588–9 (1st Cir. 1996), *cert. denied,* 513 U.S. 1111, 115 S.Ct. 901, 130 L.Ed.2d 785 (1995), (violation of IAD by failing to return prisoner to sending state immediately after trial did not constitute violation of due process or equal protection rights); *Diggs v. Owens,* 833 F.2d 439, 442 (3rd Cir.1987) *cert. denied,* 485 U.S. 979, 108 S.Ct. 1277, 99 L.Ed.2d 488 (1988), (IAD is set of procedural rules, the violation of which does not infringe upon a constitution right); *Reed v. Clark,* 984 F.2d 209, 210 (7th Cir. 1993), *aff'd sub nom,* 512 U.S. 339, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994), (IAD procedures are not constitutional rights); *Camp v. United States,* 587 F.2d 397, 400 (8th Cir. 1978) ("the IAD amounts to nothing more than a statutory set of procedural rules which clearly do not give rise to the level of constitutionally guaranteed rights."); *Greathouse v. United States,* 655 F.2d 1032, 1034 (10th Cir.1981) *(per curiam ), cert. denied,* 455 U.S. 926, 102 S.Ct. 1289, 71 L.Ed.2d 469 (1982) ("[t]he rights created by the IADA are statutory, not fundamental or constitutional in nature."); *Yellen v. Cooper,* 828 F.2d 1471

(10th Cir.1987) (same); *Seymore v. Alabama,* 846 F.2d 1355, 1359 (11th Cir.1988), *cert. denied,* 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 806 (1989), (addressing IAD violation as non-constitutional claim); *State v. Vinson,* 182 S.W.3d 709, 711 (Mo.Ct.App. 2006) (IAD rights are statutory, not constitutional); *Finley v. State,* 295 Ark. 357, 748 S.W.2d 643, 647 (1988) (IAD provisions do not rise to level of constitutionally protected rights); *State v. Nonahal,* 241 Wis.2d 397, 626 N.W.2d 1, 4 (Ct.App.2001) (rights under IAD are statutory, not constitutional, in nature). As noted by the United States Court of Appeals for the Third Circuit, "[t]he IAD, ..., constitutes nothing more than a set of procedural rules. The statutory right to dismissal due to an administrative violation of these rules is therefore not 'fundamental', even though its impact on a defendant may be great." *United States v. Palmer,* 574 F.2d 164, 167 (3rd Cir.1978), *cert. denied,* 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1138 (1978). Accordingly, rights which are statutory in nature and which clearly do not give rise to the level of right guaranteed by either the *Constitution of West Virginia* or the *Constitution of the United States.*

■ With respect to the IAD, our review of the *Constitution of West Virginia* reveals no protections greater than those bestowed by the *Constitution of the United States.* Simply put, any statutory rights created by the Legislature's adoption of the multi-state IAD are statutory rights. Thus, we hold that any rights created by the provisions of the *Interstate Agreement on Detainers Act,* W. Va.Code § 62–14–1, *et seq.* (1971), are rights which are statutory in nature and which clearly do not give rise to the level of right guaranteed by either the *Constitution of West Virginia* or the *Constitution of the United States.*

### ii.

### Violation of the IAD does not deprive a trial court of jurisdiction

■ The circuit court granted Pethel habeas relief finding that he was tried without jurisdiction due to a pre-trial violation of the IAD's anti-shuttling provision. The circuit court, however, cited no authority to support its finding that a violation of the IAD's anti-shuttling provision removes a trial court's jurisdiction to proceed to trial on the underlying criminal charges. Finding significant contrary authority, we reverse the finding of the circuit court. Courts addressing this jurisdictional issue have consistently found that the IAD is a non-jurisdictional statute, the violation of which does not deny a court jurisdiction over the criminal proceedings. *See, Camp,* 587 F.2d at 400 (violation of IAD is a non-jurisdictional error); *Palmer,* 574 F.2d at 167 (violation of IAD "is not sufficiently important to deny a court jurisdiction to entertain a guilty plea"); *Kowalak v. United States,* 645 F.2d 534, 537 (6th Cir. 1981) (IAD rights are non-jurisdictional); *United States v. Hach,* 615 F.2d 1203, 1204 (8th Cir.1980), *cert. denied,* 446 U.S. 912, 100 S.Ct. 1843, 64 L.Ed.2d 266 (1980) (violation of IAD is non-jurisdictional error); *Caniff v. Moore,* 269 F.3d 1245, 1247 (11th Cir.2001) (violation of IAD does not remove trial court's jurisdiction as IAD does not contain jurisdictional element); *United States v. Paige,* 332 F.Supp.2d 467, 471 (D.R.I.2004) (IAD violations are non-jurisdictional); *Finley,* 748 S.W.2d at 646 (violation of IAD provisions is non-jurisdictional error); *Belcher v. State,* 112 S.W.3d 118, 120 (Mo.Ct. App.2003) (compliance with the IAD is not jurisdictional requirement). *See also, Reed,* 512 U.S. at 358, 114 S.Ct. at 2302 (Scalia, J. and Thomas, J., concurring in part and concurring in judgment) (violation of IAD technicality "neither produces nor is analogous to (1) lack of jurisdiction of the convicting court, (2) constitutional violation, or (3) miscarriage of justice or denial of rudimentary procedures.").

■ "As the Court explained in *Camp,* the IAD does not go to the power of the court to try a case; but, rather, it deals with the power of the prosecution to proceed against a person charged with a criminal offense." *Paige,* 332 F.Supp.2d at 471, *citing, Camp,* 587 F.2d at 399 n. 4. While the violation of the IAD may have restricted the State's power to proceed against Mr. Pethel, it did not impact the trial court's jurisdiction over the

charges.[33]

Persuaded by the reasoning of our sister courts, cited above, we now hold that the *Interstate Agreement on Detainers Act*, W. Va.Code § 62–14–1, *et seq.* (1971), is not a jurisdictional statute. A violation of the *Interstate Agreement on Detainers Act*, W. Va. Code § 62–14–1, *et seq.* (1971), does not, under West Virginia law, deny a trial court jurisdiction over criminal charges.

### iii.

### Distinction between the availability of habeas relief under federal and West Virginia law

Pethal brought the instant action seeking habeas relief under West Virginia law. Thus, West Virginia law will control the outcome of this matter. However, because the IAD is also federal law, we find it necessary to address the scope of habeas relief available for alleged IAD violations under federal law in order to note both the similarities and distinctions between the relief available under West Virginia and federal law.

The availability of habeas relief under federal law and West Virginia law is not identical. As noted above, habeas relief is available in West Virginia where there has been a constitutional violation, the court lacked jurisdiction to impose the sentence, the sentence imposed was excessive or the conviction would have been subject to collateral attack pursuant to prior common or statutory law. Under federal law, a state prisoner, such as Pethel, may seek habeas relief "only on the ground that he is in custody in viola-

tion of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (1996).[34]

Prior to the United States Supreme Court decision in *Reed,* federal courts presented numerous, often conflicting, positions on the availability of habeas relief to remedy violations of the IAD. Focusing upon the IAD's status as a "federal law," the various jurisdictions concentrated their analysis upon whether the violation constituted a fundamental defect and/or whether prejudice resulted.[35] The Fourth Circuit Court of Appeals, whose jurisdiction includes West Virginia, found that violations of the IAD do not constitute fundamental defects which would entitle a state prisoner to seek federal habeas relief absent a showing of prejudice. *Bush v. Muncy,* 659 F.2d 402, 408 (4th Cir. 1981), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1259, 71 L.Ed.2d 449 (1982) (violation of IAD's anti-shuttling provision); *Kerr v. Finkbeiner,* 757 F.2d 604, 607 (4th Cir.1985), *cert. denied,* 474 U.S. 929, 106 S.Ct. 263, 88 L.Ed.2d 269 (1985) (violation of 180 day rule). · Similarly, the Eighth and Eleventh Circuits concurred with the Fourth Circuit's finding that an IAD violation did not constitute a fundamental defect, but left the door open for habeas relief upon a showing of prejudice. *See Huff v. United States,* 599 F.2d 860, 863 (8th Cir.1979), *cert. denied,* 444 U.S. 952, 100 S.Ct. 428, 62 L.Ed.2d 323 (1979) (mere violation of IAD anti-shuttling provisions, without more, does not justify habeas relief); *Seymore,* 846 F.2d at 1359 (violation of IAD is not fundamental defect

---

**33.** We pause to briefly note that any challenge to the State's power to proceed on charges are properly brought either in a pre-trial petition for writ of prohibition or on direct appeal. We rejected Pethel's direct appeal and post-trial petition for writ of prohibition in 2004. We also note the United States Court of Appeals for the First Circuit's suggestion that a defendant alleging a violation of the IAD may seek injunctive relief, pursuant to 28 U.S.C. § 1983, to compel a state to comply with the IAD. *Cross,* 87 F.3d at 588.

**34.** Federal prisoners may seek habeas relief on the basis "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sen-

tence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]" 28 U.S.C. § 2255 (1996).

**35.** Federal "habeas review is available to check violations of federal laws when the error qualifies as 'a fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with rudimentary demands of fair procedure.'" *Reed,* 512 U.S. at 348, 114 S.Ct. at 2297, *quoting, Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962). The same analysis applies in action brought by state or federal prisoners under 28 U.S.C. § 2254 and 28 U.S.C. § 2255, respectively, when the relief is based on nonconstitutional claims. *Reed,* 512 U.S. at 353–4, 114 S.Ct. at 2299–2300.

cognizable in federal habeas proceeding absent showing of prejudice).

The Third and Ninth Circuits, however, have found that the prisoner must demonstrate the IAD violation constituted a "fundamental defect" in the proceedings before federal habeas relief would be considered. *See, Casper v. Ryan,* 822 F.2d 1283, 1289–90 (3rd Cir.1987), *cert. denied,* 484 U.S. 1012, 108 S.Ct. 714, 98 L.Ed.2d 664 (1988), (claim for violation of IAD cognizable in federal habeas action only upon showing of fundamental defect); *Tinghitella v. California,* 718 F.2d 308, 310–11 (9th Cir.1983) (habeas relief available for violation of IAD, a federal law, where violation constitutes fundamental defect).

The First, Second and Sixth Circuits preclude federal habeas review for IAD violations altogether. *See, Fasano v. Hall,* 615 F.2d 555, 558 (1st Cir.1980), *cert. denied,* 449 U.S. 867, 101 S.Ct. 201, 66 L.Ed.2d 86 (1980) (violations of IAD are not "fundamental defects" indicating a "miscarriage of justice" so as to be cognizable in federal habeas proceeding); *Reilly v. Warden, FCI Petersburg,* 947 F.2d 43, 44 (2nd Cir.1991) (per curiam), *cert. denied,* 502 U.S. 1115, 112 S.Ct. 1227, 117 L.Ed.2d 462 (1992), (violation of IAD not basis for federal habeas relief); *Browning v. Foltz,* 837 F.2d 276, 283 (6th Cir.1988), *cert. denied,* 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989) (violation of IAD does not give rise to federal habeas relief). Conversely, the Fifth and Seventh Circuits simply recognized the availability of federal review. *See, Birdwell v. Skeen,* 983 F.2d 1332 (5th Cir.1993) (affirming grant of writ of habeas based upon IAD violation); *Webb v. Keohane,* 804 F.2d 413, 414 (7th Cir.1986) (finding violation of federal law cognizable in a federal habeas petition).

Recognizing the split in authority among the various federal courts of appeals regarding the availability of federal habeas review for IAD claims, the United States granted *certiorari* in *Reed* to address the issue in the context of the IAD's "speedy trial" provisions. *Reed,* 512 U.S. at 346, 114 S.Ct. 2291. In *Reed,* a plurality opinion, the United States Supreme Court affirmed the Seventh Circuit Court of Appeals' denial of federal habeas relief to an Indiana prisoner where the prisoner's arguments relating to violation of the IAD's speedy trial provisions had been considered and rejected by Indiana courts. *Id.* at 342, 114 S.Ct. 2291. It did not, however, provide clear guidance as to the availability of federal habeas relief to remedy IAD violations.

Justice Ginsberg, writing for the majority, found that the IAD's "speedy trial" provision does not implicate the constitutional right to a speedy trial. *Id.* at 352–3, 114 S.Ct. at 2299. Further, the majority concluded that federal habeas review may be available to both federal and state prisoners to address federal statutory violations where the prisoner has not raised the claim on direct review if the prisoner can establish both cause for the waiver and actual prejudice arising from the violation. *Id.* at 354, 114 S.Ct. 2291, *quoting, Wainwright v. Sykes,* 433 U.S. 72, 84, 97 S.Ct. 2497, 2505, 53 L.Ed.2d 594 (1977).

In light of the IAD's status as a federal law, Justice Ginsberg, joined by then—Chief Justice Rehnquist and then—Justice O'Connor, noted that the *Hill* standard governing habeas review of non-constitutional questions would be applicable to address IAD violations in the appropriate circumstance. *Id.* at 348–9, 114 S.Ct. 2291. However, these Justices found, in light of the defendant's clear failure to object to the trial date prior to the expiration of the 120 day time limit, that "[a]n unwitting judicial slip of the kind involved [there] ranks with the nonconstitutional lapses [they] have held not cognizable in a post-conviction proceeding." *Id.* at 349, 114 S.Ct. 2291. These three Justices concluded that the state court's failure to observe the IAD's 120 day rule was not cognizable in a federal habeas proceeding where "the defendant registered no objection to the trial date at the time it was set, and suffered no prejudice attributable to the delayed commencement." *Id.* at 352, 114 S.Ct. 2291.

In a separate opinion authored by Justice Scalia and joined by Justice Thomas, Justice Scalia agreed that the *Hill* "fundamental defect" test was the appropriate standard to apply in habeas actions brought by both federal and state prisoners alleging a statutory violation. *Id.* at 355–6, 114 S.Ct. 2291. However, Justice Scalia disagreed with Jus-

tice Ginsberg's reliance upon the prisoner's failure to object to the trial delay and waiver analysis. *Id.* at 356–7, 114 S.Ct. at 2301. Justice Scalia noted that

> [t]he class of procedural rights that are *not* guaranteed by the Constitution (which includes the Due Process Clauses), but that nonetheless *are* inherently necessary to avoid "a complete miscarriage of justice," or numbered among "the rudimentary demands of fair procedure," "is no doubt a small one, if it indeed not a null set."

*Id.* at 357, 114 S.Ct. 2291 (emphasis in original). Justice Scalia proceeded to affirmatively conclude:

> If there was ever a technical rule, the IAD's 120–day limit is one. I think we produce confusion by declining to state the obvious: that violation of that technicality, intentional or unintentional, neither produces nor is analogous to (1) lack of jurisdiction of the convicting court, (2) constitutional violation, or (3) miscarriage of justice or denial of rudimentary procedures. *It is no basis for federal habeas relief.*

*Id.* at 358, 114 S.Ct. 2291 (emphasis added).

Conversely, a dissenting opinion authored by then-Justice Blackman and joined by Justices Stevens, Kennedy and Souter, disagreed completely with the plurality decision. The dissenters found distinctions between the scope of relief available in habeas proceedings, arguing the importance of broader federal oversight of state proceedings to promote uniformity. *Id.* at 361–6, 114 S.Ct. 2291. Likewise, the dissenters opined that non-constitutional claims should be treated no differently than constitutional claims in habeas proceedings. *Id.* at 364–6, 114 S.Ct. 2291. Stressing the statutory dismissal provisions for IAD violations, the dissenters concluded federal habeas relief should be available to address violations where the state has failed to act. *Id.* at 367–70, 114 S.Ct. 2291.

Analyzing the impact of *Reed*'s plurality opinion, the United States Court of Appeals for the Sixth Circuit has stated:

> The standard, then, appears to be that nonconstitutional claims not raised at trial or on direct appeal are waived for collateral review except where the errors amount

to something akin to a denial of due process.... Hence, when a federal statute, but not the Constitution, is the basis for post-conviction attack, collateral relief from a defaulted claim of error is appropriate only where there has been fundamental unfairness, or what amounts to a breakdown of the trial process.

*Grant v. United States,* 72 F.3d 503 (6th Cir.1996), *cert. denied,* 517 U.S. 1200, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996) *citing Reed. See also, Medellin v. Dretke,* 544 U.S. 660, 125 S.Ct. 2088, 161 L.Ed.2d 982 (2005) (*per curiam* ) (noting violation of federal statutory rights constitute non-constitutional lapses not cognizable in habeas action unless they meet the *Hill* fundamental defect test). Post-*Reed,* federal courts require a showing of exceptional circumstances demonstrating prejudice amounting to a miscarriage of justice before deeming an IAD violation cognizable in a federal habeas action. *Cross,* 87 F.3d at 587–8 (claim of IAD violation not cognizable in habeas action as IAD provision at issue has nothing to do with securing a fair trial and there has been no allegation that violation impaired defense or appeal); *Lara v. Johnson,* 141 F.3d 239, 242 (5th Cir.1998) (must show exceptional circumstance that violation of IAD constitutes fundamental defect causing a miscarriage of justice to the prejudice of the defendant before claim is cognizable under federal habeas statutes); *Remeta v. Singletary,* 85 F.3d 513, 519 (11th Cir.1996), *cert. denied,* 520 U.S. 1225, 117 S.Ct. 1727, 137 L.Ed.2d 848 (1997) ("IAD violations are not cognizable in habeas proceedings absent a showing that the violation prejudiced the rights of the accused by affecting or impugning the integrity of the fact-finding process"); *Maggard v. Gammon,* 197 F.Supp.2d 1321, 1330–31 (D.Kan.2002) (technical violation of IAD does not present special circumstances warranting federal habeas relief as where there is no allegation that delay in trial rendered trial unfair, prevented presentation of defense or led to conviction of an innocent man).

Thus, it appears that the availability of federal habeas relief for a violation of the IAD is extremely narrow and is limited to those rare circumstances where the

**594**

violation results in a fundamental miscarriage of justice, such as the incarceration of an innocent man. As noted in *Fasano:*

> the fact that the violations of the IAD alleged by appellant had no bearing on the determination of his guilt or innocence is particularly important, although not necessarily dispositive, in determining cognizability in a habeas proceeding. The central purpose of the habeas writ is to provide a collateral means of redressing the wrong inherent in the incarceration of one who is not guilty. *Schneckloth v. Bustamonte,* 412 U.S. 218, 256–58, 93 S.Ct. 2041, 2062–63, 36 L.Ed.2d 854 (1973) (Powell, J. concurring).

*Fasano,* 615 F.2d at 558. Where habeas relief is sought based upon an alleged violation of federal law, such as a violation of the IAD instead of a constitutional or jurisdictional error, federal courts wisely limit the scope of available relief to those errors constituting a fundamental miscarriage of justice impinging upon the underlying question of guilt.

 Unlike federal habeas relief, which may be available where a violation of federal statutory law rises to the level of a fundamental defect in the proceedings, habeas relief is not available in West Virginia solely on the basis of a violation of statutory law.[36] West Virginia limits the availability of habeas relief to constitutional violations, jurisdictional errors, illegal sentences and those convictions which would have been subject to collateral attack by statute or at common-law prior to the adoption of our post-conviction habeas statute. W. Va.Code § 53–4A–1 (a). By so restricting the availability of

habeas relief, our jurisprudence is concerned with remedying defects in the proceeding which constitute a fundamental miscarriage of justice or which result in the imprisonment of a innocent man and which were not adjudicated on direct appeal.

 Under West Virginia law, the provisions of the IAD do not rise to the level of constitutionally protected rights nor do they control a trial court's jurisdiction over criminal proceedings. They are procedural technicalities which do not affect a trial court's power.[37] As such, they do not fall within the parameters of our habeas statute. The violation of the IAD alleged herein did not impact the fairness of Pethel's trial or lead to the incarceration of an innocent man. Habeas relief is simply not available, under West Virginia law, to remedy a violation of a procedural technicality, such as the violation of a statutory IAD provision.[38] Accordingly, we now hold that the violation of a provision of the *Interstate Agreement on Detainers Act,* W. Va.Code § 62–14–1, *et seq.* (1971), is not cognizable in a post-conviction habeas corpus action brought pursuant to West Virginia Code § 53–4A–1 (1967). Therefore, we reverse the circuit court's grant of habeas relief to Pethel because the same was based upon a violation of the IAD's anti-shuttling provision.

### B.

### Waiver by Guilty Plea

 Following his conviction on all charges relating to illegal sexual conduct, with minors May 22, 2006, Pethel pleaded guilty to possession of a controlled substance

---

**36.** Statutory violations may be relevant in habeas actions where the statutory violation impacts a person's constitutional rights or results in illegal sentencing.

**37.** As noted by the California Court of Appeals for the Fifth District, "[t]he IAD amounts to nothing more than a set of procedural rules, and the rights it protects in no way affect the fairness and accuracy of the fact-finding procedure or other due process or trial rights." *People v. Nitz,* 219 Cal.App.3d 164, 170, 268 Cal.Rptr. 54 (1990).

**38.** In the instant matter, this Court unanimously rejected Pethel's direct appeal raising the IAD

violation in 2004. In *Smith v. Hedrick,* 181 W.Va. 394, 382 S.E.2d 588 (1989), we held that the rejection of a petition for appeal does not constitute a decision on the merits precluding all future consideration of the issues raised therein. We must note, however, that to the extent issues raised in a rejected petition for appeal are later sought to be raised in a habeas proceeding, the issues must fall within the parameters of W. Va.Code § 53–4A–1 (1967) before they may be considered.

However, remedies do exist outside the context of a habeas proceeding for alleged violations of the IAD. *See,* note 33, *supra.*

and nighttime burglary in exchange for the dismissal of the remaining charges contained in the September 1999 indictment. This plea necessarily affects his claims arising from a violation of the IAD. As this Court stated in *State v. Greene*, 196 W.Va. 500, 505, 473 S.E.2d 921, 926 (1996), "[i]f any principle is well settled in this State, it is that, in the absence of special circumstances, a guilty plea waives all antecedent constitutional and statutory violations save those with jurisdictional consequences." *See also, State v. Bennett*, 179 W.Va. 464, 475, 370 S.E.2d 120, 131 (1988) ("the defendant waives all procedural objections except the jurisdiction of the court and the voluntariness of his plea when he pleads guilty.").

Numerous courts addressing the issue have found that a defendant's rights under IAD may be waived, including by entry of a guilty plea, so long as the waiver is voluntary. *New York v. Hill*, 528 U.S. 110, 114, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000); *Palmer*, 574 F.2d at 167; *United States v. Oldaker*, 823 F.2d 778, 780 (4th Cir.1987); *Webb v. Keohane*, 804 F.2d 413, 414 (7th Cir.1986); *United States v. Eaddy*, 595 F.2d 341, 344 (6th Cir.1979); *Camp*, 587 F.2d at 400; *Black*, 609 F.2d at 1334; *Gray v. Benson*, 608 F.2d 825, 826 (10th Cir.1979); *Paige*, 332 F.Supp.2d at 471; *Finley*, 748 S.W.2d at 646–7; *Vinson*, 182 S.W.3d at 712 ("defendant may waive his or her protections under the IAD's anti-shuttling provision even where they do not do so knowingly or intelligently"); *Nonahal*, 626 N.W.2d at 4.

■■■■■■ We have previously held, herein, that the IAD is not a jurisdictional statute the violation of which impacts a circuit court's jurisdiction over criminal proceedings. Our law is well established that non-jurisdictional errors are waived by the entry of a voluntary guilty plea. Thus, consistent with jurisdictions addressing the issue of a guilty plea's effect on violations of the IAD and our

law established in other contexts, we now hold that a defendant's voluntary entry of a guilty plea waives all rights conferred under the *Interstate Agreement on Detainers Act*, W. Va.Code § 62–14–1, *et seq.* (1971), including the right to dismissal of charges upon violation of its provisions.

■■■■ The September 1999 indictment included both the charges for which Pethel was convicted and those for which he pleaded guilty. The IAD speaks to dismissal of the "indictment" when there is a violation of the anti-shuttling procedures. In the instant action, we are presented with a situation where there was an IAD violation, and where Pethel was convicted on certain charges contained in the indictment and pleaded guilty to others. Neither the IAD nor any court decision discovered by this Court addresses this situation. An argument can be made that by pleading guilty to some charges contained in the indictment, Pethel waived his IAD claims relative to all charges contained in the indictment. However, this Court is unwilling to find the guilty plea waived the violation as to all charges contained in the indictment under the circumstances presented herein where the guilty plea did not come until after Pethel was convicted on the more serious charges. We leave open for another day the extent to which a guilty plea as to some charges in an indictment waives the rights contained in the IAD as to all charges in the indictment. Instead, we find that Pethel's guilty plea relative to the drug and burglary charges in the indictment waived his claims based upon violation of the IAD as to the indictment's drug and burglary related charges.[39]

## C.

### Dismissal for violation of the IAD may be with or without prejudice

Assuming, for the sake of argument, that this Court had found that an IAD violation

---

**39.** A question also exists in this Court's view, as to whether Mr. Pethel waived all provisions of the IAD when he failed to affirmative object to his return to Ohio after arraignment. In *Reed*, Justice Ginsberg found the violation of the IAD's trial time limit was not cognizable in a habeas action where the defendant failed to clearly object to the trial date at the time it was set. *Reed*,

512 U.S. at 349, 352, 114 S.Ct. 2291. Our review of the relevant hearing transcripts at issue herein reveals that Pethel did not clearly object to his return to Ohio before he was returned. The closest this Court can come to finding an objection is counsel's statement that Pethel did not object to remaining in West Virginia pending trial.

could be brought in a habeas proceeding, we would have reversed the lower court's dismissal with prejudice and ordered the case dismissed without prejudice.

West Virginia became a signatory to the IAD in 1971 when it was enacted into law by our Legislature. One year earlier, in 1970, the United States Congress adopted the IAD on behalf of the federal government. 18 U.S.C.App. 2 § 1, *et seq.* (1970). The United States and its territories are defined as a "State" in both the federal and West Virginia enactment. 18 U.S.C.App. 2 § 2, Art. II(a); W. Va.Code § 62–14–1, Art. II(a). In the introductory paragraph of our statute, the Legislature stated that the IAD was "hereby enacted into law and entered into by this State with all other jurisdictions legally joining therein in the form substantially as follows[.]" W. Va.Code § 62–14–1. The same language is included in the federal statute. 18 U.S.C.App. 2 § 2, Art. I.

In 1988, Congress amended the federal IAD to include a new provision affecting dismissals for violation of the IAD. This provision, codified at 18 U.S.C.App. 2 § 9, provides:

> Notwithstanding any provision of the agreement on detainers to the contrary, in a case in which the United States is a receiving State—
>
> > (1) any order of a court dismissing any indictment, information, or complaint may be *with or without prejudice.* In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: The seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of the agreement on detainers and on the administration of justice; and
> >
> > (2) it shall not be a violation of the agreement on detainers if prior to trial the prisoner is returned to the custody of the sending State pursuant to an or-

der of the appropriate court issued after reasonable notice to the prisoner and the United States and an opportunity for a hearing.

[Emphasis added.] This provision, by its terms, alters the IAD mandatory dismissal provisions, by providing that a dismissal may be with or without prejudice and by setting forth the factors to consider in considering the prejudice determination.

The state's IAD does not provide for dismissal without prejudice. This Court held in Syllabus Point 4 of *Moore v. Whyte,* 164 W.Va. 718, 266 S.E.2d 137 (1980), that pursuant to our IAD statute, "[i]f West Virginia obtains custody of a prisoner against whom a detainer has been lodged and returns him to the original place of confinement before trying him, the charges must be dismissed with prejudice." [40] The decision in *Moore* was decided prior to the amendment of the federal IAD, which now permits dismissal without prejudice. In light of the amendment to the federal IAD and for the reasons set out below, the decision in *Moore* is hereby overruled.

To begin, "under our rule-making authority . . . rules promulgated by this Court have the force and effect of law and will supersede procedural statutes that conflict with them." *State v. Davis,* 178 W.Va. 87, 90, 357 S.E.2d 769, 772 (1987), *overruled on other grounds, State ex rel. R.L. v. Bedell,* 192 W.Va. 435, 452 S.E.2d 893 (1994). *See* W. Va. Const. Art. VIII, § 3 ("The court shall have power to promulgate rules for all cases and proceedings, civil and criminal, for all of the courts of the State relating to writs, warrants, process practice and procedure, which shall have the force and effect of law."). The issue of dismissing an indictment is a procedural matter that this Court has the exclusive constitutional authority to address. *See, State v. Arbaugh,* 215 W.Va. 132, 138, 595 S.E.2d 289, 295 (2004)(Davis, J., dissenting) ("a statute governing procedural matters in [civil or] criminal cases which conflicts with a rule promulgated by the Su-

---

**40.** In addressing another aspect of the state's IAD, Syllabus Point 3 of *Moore* states "[i]f West Virginia obtains custody of a prisoner against whom a detainer has been lodged, the prisoner

must be tried within one hundred twenty days of his arrival in the State, absent a good cause motion for a continuance made in open court, or the charge must be dismissed with prejudice."

preme Court would be a legislative invasion of the court's rule-making powers.") (Internal citations omitted). For example, Rule 48(b) of our Rules of Criminal Procedure provides that if there is unnecessary delay in prosecuting a defendant, a trial court should dismiss the indictment without prejudice.[41] Although Rule 48(b) addresses a specific type of delay in prosecuting a defendant, it articulates the position of this Court that "[n]ormally ... when a trial court dismisses a case ... the dismissal [should be] without prejudice." *State ex rel. Brum v. Bradley*, 214 W.Va. 493, 497, 590 S.E.2d 686, 690 (2003). *See e.g., State ex rel. Pinson v. Maynard*, 181 W.Va. 662, 383 S.E.2d 844 (1989)(requiring dismissal without prejudice for witness misconduct).[42] Insofar as the mandatory dismissal provision of our state IAD is inconsistent with Rule 48(b) and the general dismissal principles of this Court, such provision is of no force or effect in IAD proceedings. *See*, Syl. Pt. 5, *State v. Wallace*, 205 W.Va. 155, 517 S.E.2d 20 (1999)("The West Virginia Rules of Criminal Procedure are the paramount authority controlling criminal proceedings before the circuit courts of this jurisdiction; any statutory or common-law procedural rule that conflicts with these Rules is presumptively without force or effect.").

 Accordingly, we find it necessary to adopt the 1988 federal amendments to the IAD into the laws of this State and hold that in a case in which West Virginia is a receiving State pursuant to the *Interstate Agreement on Detainers Act*, W. Va.Code § 62–14–1, *et seq.* (1971), any order of a court

dismissing any indictment, information, or complaint may be with or without prejudice. In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of the agreement on detainers and on the administration of justice. It shall not be a violation of the agreement on detainers if, prior to trial, the prisoner is returned to the custody of the sending State pursuant to an order of the appropriate court issued after reasonable notice to the prisoner and the State of West Virginia and an opportunity for a hearing.

 Applying the amendments to Pethel's case, the factors for determining whether the dismissal should be with or without prejudice indicate that any dismissal should have been without prejudice. Mr. Pethel was charged with very serious crimes involving the sexual abuse and exploitation of children. His return to Ohio, while a technical violation of the IAD, did not prejudice his ability to prepare a defense and was effected without his clear objection or mention of the IAD. Finally, the administration of justice would have been severely harmed by dismissing the charges against him with prejudice.

As we previously indicated, we need not reverse the circuit court's dismissal with prejudice and order dismissal without prejudice because we have found that an IAD claim may not be brought in a habeas proceeding.[43]

---

**41.** Our case law has indicated that it is only when a "trial court is of the opinion that the state has deliberately or oppressively sought to delay a trial ... and such delay has resulted in substantial prejudice to the accused, the trial court may ... dismiss the indictment with prejudice[.]" Syl. pt 4, *State ex rel. Shorter v. Hey*, 170 W.Va. 249, 294 S.E.2d 51 (1981).

**42.** We should note "that habeas corpus proceedings are civil rather than criminal in nature[.]" *Perdue v. Coiner*, 156 W.Va. 467, 468, 194 S.E.2d 657, 659 (1973). Consequently, Rule 10 of our Rules Governing Post–Conviction Habeas Corpus Proceedings, provides that the "Rules of Civil Procedure ... may be applied, when appropriate, to petitions [for habeas relief]." Under our Rules of Civil Procedure, a dismissal for whatev-

er reason is generally required to be without prejudice. *See e.g,* Syl. Pt. 3, in part, *Burkes v. Fas–Chek Food Mart Inc*, 217 W.Va. 291, 617 S.E.2d 838 (2005)("Under Rule 4(k) of the West Virginia Rules of Civil Procedure, if a plaintiff fails to serve a summons and complaint upon a defendant within 120 days, then the circuit court should dismiss the action against that defendant without prejudice.").

**43.** Our adoption of the federal amendment to its IAD can be imposed against Mr. Pethel because this issue is purely procedural and does not affect any substantive rights. *See Collins v. Youngblood*, 497 U.S. 37, 45, 110 S.Ct. 2715, 2720, 111 L.Ed.2d 30 (1990)("[A] procedural change may constitute an ex post facto violation if it affect[s] matters of substance, by depriving a defendant of

## IV.

## CONCLUSION

The decision of the Circuit Court of Ohio County, West Virginia, granting habeas relief to Pethel is hereby reversed. Contrary to the circuit court's conclusion, a violation of the IAD does not remove the trial court's jurisdiction over criminal charges. Further, because the IAD does not implicate constitutional or jurisdictional matters, a claim arising from a violation of the IAD's anti-shuttling provisions is not cognizable in a post-conviction habeas proceeding under West Virginia law. Pethel's failure to appeal this Court's refusal of his appeal petition and his guilty plea to certain charges waived any IAD claim he may have had with respect to those charges.

**Reversed**

STARCHER, J., dissenting.
(Filed July 12 2006)

I write separately to express my disagreement with the majority decision. In my judgment *Alabama v. Bozeman*, 533 U.S. 146, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001) clearly controls the outcome of this case and the circuit court should be affirmed.

To avoid what should be the obvious application of *Bozeman* to this case, the majority spews out a "parade of the horribles" from the facts in the underlying case simply to poison the water to persuade the reader of the opinion that *this* defendant should be granted no relief. Next, the majority has "manufactured" a series of syllabus points that are result-oriented with obfuscated meanings, all to avoid writing anything that might be favorable to a criminal defendant with whom it is easy to find disfavor. I disagree with using a parade of the horribles to serve as "persuasive language" when the facts of the criminal charges in the underlying case are not really relevant to deciding the case. This case should have been decided on what happened procedurally below and the law—not how bad a defendant's past conduct may appear to be.

First, I believe that the procedural aspect of the majority opinion—which states that post-conviction habeas corpus actions under *W.Va.Code*, 53–4A–1 (1967) may not be used to test the validity of procedures under the *Interstate Agreement on Detainers Act* ("IAD"), *W.Va.Code*, 62–14–1, *et seq.* (1971) because the IAD post-dates the habeas statute, *W.Va.Code*, 53–4A–1 (1967)—is clearly wrong.

The habeas statute, *W.Va.Code*, 53–4A–1(a)(1967), states in part that:

Any person convicted of a crime and incarcerated under sentence of imprisonment therefor who contends that ... the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under the common law *or any statutory provi-*

---

substantial protections with which the existing law surrounds the person accused of crime, or arbitrarily infringing upon substantial personal rights.")(Internal quotations and citations omitted); *Dobbert v. Florida*, 432 U.S. 282, 293–294, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977) ("Even though it may work to the disadvantage of a defendant, a procedural change is not ex post facto.... In the case at hand, the change in the statute was clearly procedural. The new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime."); Syl. Pt. 5, *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979)("In determining whether to extend full retroactivity, the following factors are to be considered: First, the nature of the substantive issue overruled must be determined. If the issue involves a traditionally settled area of law, such as contracts or property as distinguished from torts, and the new rule was not clearly foreshadowed, then retroactivity is less justified. Second, where the overruled decision deals with procedural law rather than substantive, retroactivity ordinarily will be more readily accorded. Third, common law decisions, when overruled, may result in the overruling decision being given retroactive effect, since the substantive issue usually has a narrower impact and is likely to involve fewer parties. Fourth, where, on the other hand, substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent, prospective application will ordinarily be favored. Fifth, the more radically the new decision departs from previous substantive law, the greater the need for limiting retroactivity. Finally, this Court will also look to the precedent of other courts which have determined the retroactive/prospective question in the same area of the law in their overruling decisions.").

*sion* of this State . . ., may . . . file a petition for a writ of habeas corpus ad subjiciendum, and prosecute the same, seeking release from such illegal imprisonment, correction of the sentence, the setting aside of the plea, conviction and sentence, or *other relief* . . . .

(Emphasis added). The interpretation given to this statute by the majority excludes by implication from the post-conviction habeas corpus procedure all issues arising from statutes adopted by our Legislature after 1967. This is not logical, nor do I believe that such an interpretation was intended by the Legislature.

We held in Syllabus Point 4 of *Losh v. McKenzie,* 166 W.Va. 762, 277 S.E.2d 606 (1981) that " . . . an applicant [for habeas corpus relief] may . . . petition [under *W.Va. Code,* 53–4A–1, *et seq.* (1967) ] the court on the following grounds: . . . a change in the law, favorable to the applicant, which may be applied retroactively." *Bozeman* was applied retroactively by the U.S. Supreme Court. *Bozeman* was decided after Pethel's conviction and sentencing. Thus, the legal landscape was changed favorable to Pethel, and under *Losh,* the matter is properly before this Court.

Second, the majority opinion holds that dismissals under the West Virginia IAD may be with or without prejudice; this is likewise clearly wrong. The majority opinion on this point turns on Congressional passage of amendments to the federal IAD in 1988 which permitted dismissals and under the federal IAD to be either with or without prejudice, 18 U.S.C.App. 2 § 9, and upon our state Constitutional rule making authority. The opinion, however, ignores the fact that *Bozeman* was decided *after* the passage of the federal amendments. Furthermore, *Bozeman* involved an interpretation of Alabama's IAD which contains the same dismissal language as West Virginia's IAD.[1]

Finally, the majority opinion ignores express language in *Bozeman,* where the U.S. Supreme Court stated:

As "a congressionally sanctioned interstate compact" within the Compact Clause of the United States Constitution, Art. I, § 10, cl. 3, the [Interstate Agreement on Detainers] is a federal law subject to federal construction.

533 U.S. at 149, 121 S.Ct. at 2082, 150 L.Ed.2d at 192 (*quoting New York v. Hill,* 528 U.S. 110, 111, 120 S.Ct. 659, 662, 145 L.Ed.2d 560 (2000), *and citing Carchman v. Nash,* 473 U.S. 716, 719, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985); *Cuyler v. Adams,* 449 U.S. 433, 442, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981)).

We recognized this principle in Syllabus Point 3 of *State v. Inscore,* 219 W.Va. 443, 634 S.E.2d 389 (2006), where we stated:

The Agreement on Detainers, *W.Va.Code,* 62–14–1[1971] is a congressionally-sanctioned interstate compact within the Compact Clause, *U.S. Const.,* Art.1, § 10, cl. 3, and thus is a federal law subject to federal construction.

The majority has chosen to ignore the ruling in *Bozeman* and charts a separate path, notwithstanding the clear federal construction by the U.S. Supreme Court and our recent holding in *Inscore.* A federal construction and the clear language of *Bozeman* requires a dismissal of the instant case—as the U.S. Supreme Court did in *Bozeman* and the circuit court below did in the instant case.

I can understand why the majority finds the conduct of the defendant giving rise to the underlying case distasteful; so do I. Nevertheless, as distasteful as the facts may be, I believe my oath of office provides me no other choice but to respect the decision of the United States Supreme Court.

There are times as judges and justices when we are called upon to make difficult decisions. Sometimes those decisions are not only distasteful, but likely to be unpopular with the public. This case exemplifies such a circumstance. Having served as circuit judge I know the difficulty that is present when such decisions affect the very community in which we live. However, we are called to a higher duty—to uphold the rule of law. This is what the circuit judge in this case did below. And I applaud him for his courage.

---

1. *Bozeman* was decided in 2001. The affected Alabama conviction was in 1997.

Respectfully, I dissent, and I am authorized to say that Justice Albright joins in this dissent.

MAYNARD, Justice, concurring.

(Filed July 18, 2006)

Despite the assertions of the dissenting opinion to the contrary, I believe that the majority opinion is well grounded in the law.

I disagree with the dissenting opinion's contention that the United States Supreme Court's decision in *Alabama v. Bozeman,* 533 U.S. 146, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001), controls the outcome of the instant case. As explained in the majority opinion, *Bozeman* involved the direct appeal of a criminal conviction. In contrast, the instant case involves a post-conviction habeas proceeding. As correctly determined by the majority opinion, a violation of the *Interstate Agreement on Detainers Act* (IAD) is not cognizable in a post-conviction habeas action because the IAD does not pre-date the habeas statute, and does not involve illegal sentencing, constitutional protections or jurisdictional matters.

The dissenting opinion, however, disputes the majority's reasoning that a violation of the IAD is not cognizable in a post-conviction habeas action because the IAD post-dates the habeas statute. According to the dissenting opinion, such reasoning is illogical and contrary to what the Legislature intended. Nevertheless, the plain language of the post-conviction habeas statute, W.Va.Code § 53–4A–1(a)(1967), appears to indicate that this is exactly what the Legislature intended. This language provides that,

Any person convicted of a crime and incarcerated under sentence of imprisonment therefor who contends that ... the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error *heretofore* available under the common-law or any statutory provision of this State, may, without paying a filing fee, file a petition for a writ of habeas corpus ad subjiciendum[.] (Emphasis added).

Thus, as found in the majority opinion based on this language, because the IAD's anti-shuttling provision was not heretofore available under the common law or statute, it is not subject to collateral attack under the post-conviction habeas statute.

In conclusion, the majority opinion is not result-oriented. Rather, it is a careful and thorough legal analysis, and its holdings and conclusions are supported by the law. Therefore, I concur.